UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
IN RE: AIR CRASH AT BELLE HARBOR,
NEW YORK ON NOVEMBER 12, 2001

MDL NO. 1448 (RWS)

REDACTED OPINION

------------------------------------------X
FABRIZIO OSKAR CARTY and FIORINA MARIA
SANCHEZ, as Administrators of the
Estate of GEMINIZ GARCIA CARTY, a/k/a
GENIMIZ GARCIA-CARTEY, and as
Administrators of the Estate of
GILBERT CARTY, an infant,

[UNREDACTED VERSION
FILED UNDER SEAL
MAY 2, 2005]

                    Plaintiffs,

    - against -

02 Civ. 3161 (RWS)

02 Civ. 4755 (RWS)

AMERICAN AIRLINES, INC.,AIRBUS
INDUSTRIE, AIRBUS INDUSTRIE GIE,
AMR CORPORATION, AIRBUS INDUSTRIE OF
NORTH AMERICA HOLDINGS, INC.,
AIRBUS INDUSTRIE OF NORTH AMERICA,
INC., and AIR SERVICE CO., INC.,

03 Civ. 8322 (RWS)

                    Defendants.
------------------------------------------X
OLGA GARCIA,

                    Plaintiff,

    - against -

AMERICAN AIRLINES, INC. and
AIRBUS INDUSTRIE, G.I.E.,

                    Defendants.
------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5-10-05

A P P E A R A N C E S:

     LAW OFFICES OF HERIBERTO A. CABRERA
     Attorneys for Plaintiffs Administrators of
          Estate of GENIMIZ CARTY
     5615 Fifth Avenue
     Brooklyn, NY 11220

     DANKER & MILSTEIN, P.C.
     Attorneys for Plaintiff OLGA GARCIA
     41 East 57th Street
     New York, NY 10022
     By:  ABRAMI I. BOHRER, ESQ.
          Of Counsel

Sweet, D.J.,

Plaintiff Fabrizio Carty ("Carty") and plaintiff Olga Garcia ("Garcia") have brought separate actions against American Airlines, Airbus Industrie GIE, et al. (the "Defendants") alleging damages arising from the deaths of Genimiz Garcia Carty ("Genimiz") and Gilbert Carty ("Gilbert"), both of whom were passengers aboard American Airlines Flight 587, which crashed in the Belle Harbor area of Queens, New York on the morning of November 12, 2001.

Carty, the husband of Genimiz and father of Gilbert, and Garcia, the mother of Genimiz, have each sought a determination concerning Garcia's rights of participation in the proceeds of any settlement of the wrongful death action arising from the death of Genimiz.

## Prior Proceedings

On March 12, 2002, Carty and his mother, Fiorina Sanchez ("Sanchez"),[1] were appointed co-administrators of the estates of Genimiz and Gilbert by the Surrogate's Court of the State of New York for the County of New York (the "Manhattan Surrogate's Court"). On January 17, 2002, while his letters of administration

---

[1] According to Carty's counsel, Sanchez was named co-administrator because Carty was not a United States citizen at the time of the deaths of Genimiz and Gilbert. (See Letter from Heriberto A. Cabrera of June 14, 2004, at 1.)

1

were pending with the Manhattan Surrogate's Court, Carty, acting in his personal capacity and as co-administrator of the estates of Genimiz and Gilbert, filed a complaint against the Defendants in the Eastern District of New York. On March 25, 2002, Garcia, acting in her individual capacity and as a personal representative of Genimiz' estate, filed a complaint against American Airlines, Inc. in the Northern District of Texas. On May 2, 2002, the Judicial Panel on Multidistrict Litigation transferred the Carty action to this Court for pretrial processing pursuant to 28 U.S.C. § 1407.[2] On June 21, 2002, the Garcia action was similarly transferred to this Court.[3] On October 21, 2003, despite the fact that she already had an action pending before this Court, Garcia filed a new action in this district against the Defendants.[4]

In early 2004, a settlement of claims arising from the deaths of Genimiz and Gilbert was apparently negotiated with the Defendants. On June 10, 2004, Carty and Garcia appeared before the Court for a hearing to resolve the question of how to properly distribute settlement proceeds. At that time, a ninety-day adjournment was granted so that additional discovery could be

---

[2] Upon transfer, the Carty action, which had been docketed in the Eastern District of New York as 02 Civ. 0394, was assigned a new docket number: 02 Civ. 3161.

[3] Upon transfer, the Garcia action, which had been docketed in the Northern District of Texas as 3-02-CV-0607 H, was also assigned a new docket number: 02 Civ. 4755.

[4] This second Garcia action was assigned docket number 03 Civ. 8322.

taken. On October 5, 2004, the Court ordered Carty and Garcia to schedule a hearing to determine their rights of distribution in settlement proceeds. Pursuant to this order, a three-day hearing was commenced on October 29, 2004. The hearing was completed on November 11, 2004, and the present motion was marked as fully submitted on November 15, 2004.

**Preliminary Issues**

### A. Garcia's Texas Action (02 Civ. 4755) Is Dismissed For Failure To Prosecute

Garcia appears to have abandoned the 2002 action that she brought in the Northern District of Texas in favor of the 2003 action that she brought in this district. J. Michael Moore, Esq. ("Moore"), the attorney representing Garcia in her Texas action, has not appeared at any of the hearings held in connection with this dispute despite the fact that he was ordered to do so pursuant to this Court's order of October 5. Moreover, there is no record that any discovery has been taken in connection with the Texas action, and it does not appear that Moore has participated in any settlement discussions with the Defendants.

In light of Garcia's above-described failure to prosecute the Texas claim, dismissal is warranted pursuant to Fed. R. Civ. P. 41(b). Rule 41(b) provides in pertinent part that "[f]or failure of the plaintiff to prosecute . . . , a defendant may move for

dismissal of an action or of any claim against the defendant." It is well established that "'[a] district court may, sua sponte, dismiss an action for lack of prosecution pursuant to Fed. R. Civ. P. 41(b).'" Feurtado v. City of New York, 225 F.R.D. 474, 477 (S.D.N.Y. 2004) (quoting Minnette v. Time Warner, 997 F. 2d 1023, 1027 (2d Cir. 1993) (citing Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42-43 (2d Cir. 1982))).

To determine whether dismissal of a claim pursuant to Rule 41(b) is warranted, the Second Circuit considers the following factors:

> [1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has take[n] care to strik[e] the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard ... and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.

Jackson v. City of New York, 22 F.3d 71, 74-75 (2d Cir. 1994) (quoting Alvarez v. Simmons Mkt. Research Bureau, Inc., 839 F.2d 930, 932 (2d Cir. 1988)). No single factor is dispositive of a court's Rule 41(b) analysis. See, e.g., Spencer v. Doe, 139 F.3d 107, 113 (2d Cir. 1998).

Here, the first, fourth and fifth factors identified by the Jackson court all weigh strongly in favor of dismissal.

4

Therefore, Garcia's Texas action, which has been assigned docket number 02 Civ. 4755 by the clerk of court for this district, is hereby dismissed with prejudice.

### B. Choice of Law

Carty and Garcia have presented New York State substantive law with respect to Genimiz' wrongful death claim and the distribution of any settlement of such claim.

### C. Consolidation of Carty's and Garcia's Actions

Rule 42(a), Fed. R. Civ. P., provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order . . . all the actions consolidated." Pursuant to Rule 42(a), a district court may order consolidation sua sponte. See, e.g., Devlin v. Transp. Communications Int'l Union, 175 F.3d 121, 130 (2d Cir. 1999).

A district court has broad discretion to consolidate actions. See Consorti v. Armstrong World Indus., Inc., 72 F.3d 1003, 1006 (2d Cir. 1995), vacated on other grounds sub nom., Consorti v. Owens-Corning Fiberglas Corp., 518 U.S. 1031 (1996); International Paving Sys., Inc. v. Van-Tulco, Inc., 806 F. Supp. 17, 22 (E.D.N.Y. 1992). While this "discretion . . . is not unfettered" and "[c]onsiderations of convenience and economy must

yield to a paramount concern for a fair and impartial trial," Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990), so long as any confusion or prejudice does not outweigh efficiency concerns, consolidation will generally be appropriate.  See International Paving, 806 F. Supp. at 22.

Here, Carty and Garcia have asserted virtually identical claims against identical defendants.  Under these circumstances, efficiency concerns vastly outweigh any risk of confusion or prejudice.

Based on the foregoing, the Carty action (02 Civ. 3161) and the Garcia action (03 Civ. 8322) are hereby consolidated.

## D.  **Availability of Declaratory Relief**

Carty and Garcia have each sought a determination of Garcia's rights in the distribution of proceeds from the contemplated settlement of the wrongful death claim arising from the death of Genimiz.  Although neither party has expressly sought declaratory relief, this Court has authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and Fed. R. Civ. P. 54 and 57 to provide such relief sua sponte.  As stated by one commentator:

When a demand for coercive relief, such as a judgment for damages or injunctive relief, is not joined with a demand for declaratory relief and the coercive relief is deemed ungrantable or inappropriate, the court may sua sponte grant a declaration of rights if that relief serves a useful purpose.

12-57 Moore's Federal Practice - Civil § 57.61; see also 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2664 (3d ed. 1998) (stating that pursuant to Rule 54(c) "a party may be awarded declaratory relief . . . even though the party has not demanded it . . . ."); Gibbs v. Anchorage School District, et al., No. A94-0554 CV (HRH), 1995 WL 1036748, at *5 n.9 (D. Alaska Feb. 24, 1995) (stating that pursuant to Rule 54(c) and 28 U.S.C. § 2201(a), "[a] court can grant the type of relief to which the party is entitled even if the party does not request that type of relief).[5]

The Declaratory Judgment Act provides in pertinent part that:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an

---

[5] It has been held that a court may not provide declaratory relief sua sponte unless the parties to the dispute had reasonable notice that such relief was contemplated by the Court. See, e.g., Fordyce v. Seattle, 55 F.3d 436, 442 (9th Cir. 1995). However, under the present fact (i.e., where the relevant parties were ordered to appear for an evidentiary hearings for the express purpose of determining their rights of participation in settlement proceeds), there can be no dispute that the parties had notice that a declaration of rights was contemplated.

> appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be
> sought. Any such declaration shall have the force and
> effect of a final judgment or decree and shall be
> reviewable as such.

28 U.S.C. § 2201(a). The policy "animating the Declaratory Judgment Act . . . is to enable parties to adjudicate their disputes before either suffers great damage." Starter Corp. v. Converse, Inc., 84 F.3d 592, 596 (2d Cir. 1996) (citing In re Combustion Equipment Assocs., 838 F.2d 35, 37 (2d Cir. 1988)).

Not every dispute may be adjudicated in the federal courts as a declaratory judgment action. First, a basis for subject matter jurisdiction must exist apart from the Declaratory Judgment Act itself, as section 2201 "provides no independent basis for subject matter jurisdiction." Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir. 1996) (citing Albradco, Inc. v. Bevona, 982 F.2d 82, 85 (2d Cir. 1992)); accord Starter, 84 F.3d at 594. n8. Second, the Declaratory Judgment Act "permits declaratory relief only in cases presenting 'actual controversies,' 28 U.S.C. § 2201(a), a requirement that incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution." Niagara Mohawk Power, 94 F.3d at 752 (alteration in original) (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40 (1937)).

There is "no bright line rule for determining 'whether the dispute presents a substantial controversy or merely an abstract question' . . . . Instead, courts must decide whether a justiciable controversy exists 'on a case by case basis.'" American Pioneer Tours v. Suntrek Tours, No. 97 Civ. 6220 (DLC), 1998 WL 60944, at *2 (S.D.N.Y. Feb. 13, 1998) (citing Kidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556, 562 (2d Cir. 1991)). As the Supreme Court explained in Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270 (1941),

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Maryland Cas., 312 U.S. at 273. Thus, a declaratory judgment action "presents an actual controversy if 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Dicola v. American S.S. Owners Mut. Protection & Indem. Assoc. (In re Prudential Lines), 158 F.3d 65, 70 (2d Cir. 1998) (quoting Maryland Cas., 312 U.S. at 273); accord Starter, 84

F.3d at 594-95; <u>Olin Corp. v. Consol. Aluminum Corp.</u>, 5 F.3d 10, 17 (2d Cir. 1993).

Where it appears that "the contingent event upon which the controversy rests is unlikely to occur, the controversy lacks 'sufficient immediacy and reality' to warrant declaratory relief." <u>In re Prudential Lines</u>, 158 F.3d at 70 (citing <u>Certain Underwriters at Lloyd's v. St. Joe Minerals Corp.</u>, 90 F.3d 671, 675 (2d Cir. 1996) (observing that, "in the absence of an 'actual controversy,' a district court is without power to grant declaratory relief") (citation omitted)). Similarly,

> the disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.

<u>Jenkins v. United States</u>, 386 F.3d 415, 417-418 (2d Cir. 2004) (quoting <u>Public Serv. Comm'n of Utah v. Wycoff Co., Inc.</u>, 344 U.S. 237, 244 (1952)) (quotation marks omitted); <u>see also Certain Underwriters at Lloyd's</u>, 90 F.3d at 675 (observing that "it is by now traditional law that 'the judicial power does not extend to . . . abstract questions'") (quoting <u>Wycoff</u>, 344 U.S. at 242 (internal quotation marks and citation omitted). Furthermore, in order to satisfy Article III, the relief sought must have the potential to "completely resolve[] a concrete controversy susceptible to conclusive judicial determination." <u>Calderon v. Ashmus</u>,

523 U.S. 740, 749 (1998). "Whether a real and immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis." Kidder, Peabody, 925 F.2d at 562.

Here, there is no dispute as to the existence of federal jurisdiction. Moreover, the dispute between Carty and Garcia has "taken on fixed and final shape." Jenkins, 386 F.3d at 418. That is, this dispute is certain to arise as soon as a settlement is executed, and the dispositive question -- Carty's and Garcia's relative rights of participation, pursuant to relevant New York State law, in the settlement of the Geminiz wrongful death action -- is clear and readily determinable by this court. Furthermore, these proceedings will completely resolve the dispute that has arisen between Carty and Garcia. Based on the foregoing, it is determined that the present dispute between Carty and Garcia satisfies Article III's case or controversy limitation.

Finally, it should be noted that the advisory committee notes to Rule 57, Fed. R. Civ. P., indicate that a declaratory judgment should not be granted where a special statutory proceeding has been provided for the adjudication of the issue in dispute. The term "special statutory proceeding" has been interpreted to denote a procedure that is intended as the exclusive means for the adjudication of a particular category of case (e.g., income tax assessment cases or workers' compensation claims). See Edwin

Borchard, Declaratory Judgments, at 342-43 (2d ed. 1941). Based on this definition, no such special statutory proceeding has been provided for the adjudication of disputes concerning wrongful death proceeds. Rather, New York statutory and decisional law state that courts of general jurisdiction have concurrent jurisdiction with the Surrogate's Court to authorize an appropriate distribution of the amount of a wrongful death recovery to the persons entitled thereto. See N.Y. Est. Powers & Trust Law § 5-4.6(a)(1) (stating that upon authorization of a settlement, a trial court may, "except for good cause shown," transfer a wrongful death case to the Surrogate's Court to determine the "issues of allocation and distribution of proceeds and related matters"); Pollicina v. Misercordia Hosp. Med. Ctr., 82 N.Y.2d 332, 336, 604 N.Y.S.2d 879, 881, 624 N.E.2d 974, 976 (1993); Estate of Elder, 90 Misc. 2d 460, 462, 395 N.Y.S.2d 337, 339 (Sur. Ct. N.Y. Co. 1977).

## Discussion

The issue to be determined is Garcia's rights of participation in the settlement of the Genimiz wrongful death claim. Carty claims that Garcia is not entitled to any such participation. Garcia argues that she is entitled to a 42.098% share of the settlement. Furthermore, Garcia argues that the settlement of the causes of action arising from Gilbert's death is artificially high and designed to thwart her claims for recovery. Finally, in support of her claimed entitlement, Garcia argues that

12

Carty's sole motivation for marrying Genimiz was to obtain legal residency status and that Genimiz planned to terminate the marriage once Carty had become a legal resident.

### 1. State Law Framework For Distribution of Genimiz Wrongful Death Settlement

Section 5-4.1, N.Y. Est. Powers & Trusts L., provides in pertinent part that:

> [t]he personal representative, duly appointed in this state or any other jurisdiction, of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued.

N.Y. Est. Powers & Trusts L. § 5-4.1(1).[6]

Section 5-4.4(a) governs the distribution of wrongful death proceeds where, as here, the decedent is survived by a parent and spouse but no issue. It provides in pertinent part that "where the decedent is survived by a parent or parents and a spouse and no

---

[6] Pursuant to section 5-4.3, the plaintiff may be awarded "such sum as [the finder of fact] . . . deems to be fair and just compensation for the pecuniary injuries resulting from the decedent's death . . ." N.Y. Est. Powers & Trusts L. § 5-4.3(a). Medical and funeral expenses incurred by the distributees are similarly recoverable. Id. Interest upon the principal sum recovered by the plaintiff is also recoverable. Id. Finally, where, as here, the death occurred on or after September 1, 1982, "punitive damages may be [recovered] if such damages would have been recoverable had the decedent survived." Id. at § 5-4.3(b).

13

issue, the parent or parents will be deemed to be distributees for purposes of this section." N.Y. Est. Powers & Trusts L. § 5-4.4(a)(1). Such damages will be distributed by the personal representative "to the persons entitled thereto in proportion to the pecuniary injuries suffered by them . . . ." Id. at 5-4.4(a)(2).

The leading New York case concerning proper distribution of damages received for wrongful death is In re Kaiser's Estate, 198 Misc. 582, 100 N.Y.S.2d 218 (Sur. Ct. Kings Co. 1950). The Kaiser's Estate court stated:

> [C]ourts have considered, in arriving at a determination of the proper distribution of [wrongful death damages], the dependency upon decedent of his spouse and next of kin and the number of years they could reasonably expect support from him. They have taken into consideration the age of decedent and the surviving spouse and the ages and mental and physical condition of his descendants and whether such of them as may be infants at the time of the death of the decedent may be expected to pursue normal occupations on reaching majority or, whether because of physical or mental ailment or otherwise, they would be dependent on decedent beyond the age of twenty-one years. Using the aggregate number of years of anticipated dependency of the spouse and next of kin as a denominator and the respective years of the anticipated dependency of each of such spouse and next of kin as the numerator of the fraction, distribution has been directed to each, in the normal case, in accordance with the fractional parts of the recovery or settlement attributable to each.

In re Kaiser's Estate, 198 Misc. at 583-584, 100 N.Y.S.2d at 220. Federal courts have generally relied on In re Kaiser's Estate to determine the proper distribution of wrongful death damages

14

pursuant to New York law. See, e.g., Geddes v. Cessna Aircraft Co., 881 F. Supp. 94, 97 (E.D.N.Y. 1995); In re Application of Adler, 869 F. Supp. 1021, 1028-29 (E.D.N.Y. 1994); Harris v. Kem Corp., No. 85 Civ. 2127 (WK), 1990 WL 113135, at *1 (S.D.N.Y. Aug. 3, 1990) (approving wrongful death settlement that relied on In re Kaiser's Estate to determine proper distribution of settlement funds).[7]

New York courts have stated that the measure of pecuniary loss is the distributee's "reasonable expectancy of future assistance or support by the decedent [that] was frustrated by the decedent's death." Gonzalez v. New York City Housing Authority, 77 N.Y.2d 663, 668, 569 N.Y.S.2d 915, 918, 572 N.E.2d 598, 601 (1991) (citing Loetsch v New York City Omnibus Corp., 291 N.Y. 308, 310-311, 52 N.E.2d 448, 449 (1943)). Pecuniary loss can be demonstrated by showing: (1) that decedent had a legal duty to support the distributee or (2) that decedent would have voluntarily

---

[7] It should be noted that under certain circumstances (particularly where the interests of a decedent's young children were at issue), courts have refused to apply the In re Kaiser's Estate formula on the grounds that its application would lead to inequitable results. See, e.g., Matter of Acquafredda, 189 A.D.2d 504, 517, 596 N.Y.S.2d 839, 847 (2d Dep't 1993) (affirming a surrogate's departure from the In re Kaiser's Estate formula on the grounds that equity was best served by permitting decedent's children to receive distribution's equivalent in size to that of decedent's spouse); Matter of Estate of Feld, 153 Misc. 2d 615, 620, 582 N.Y.S.2d 922, 925-26 (Sur. Ct. N.Y. Co. 1992) ("Because Kaiser . . . makes [the] invalid assumption [that a spouse's and a child's annual losses are identical], it will not yield a correct result in a statistically or equitably acceptable number of instances. It is thus of no aid . . . in allocating the proceeds among a surviving spouse and children.")

provided such support to the distributee. See, e.g., Public Adm'r of Kings County v. U.S. Fleet Leasing, Inc., 159 A.D.2d 331, 552 N.Y.S.2d 608 (1st Dep't 1990).

Where, as here, the decedent was under no legal obligation to support a distributee, the court examines "whether, and to what extent, the [distributee] might reasonably have expected to have become recipient[] of decedent's voluntary help had decedent lived." In re Estate of Pridell, 206 Misc. 316, 319, 133 N.Y.S.2d 203, 207 (Sur. Ct. Jefferson Co. 1954). The Pridell court identified the following factors that should be assessed to determine whether there existed a reasonable expectation of voluntary assistance: (1) the nature of the relationship between the decedent and the distributee, (2) the amount or amounts customarily contributed to the distributee by the decedent, (3) other indicia of a disposition on the part of the decedent to continue to assist the survivor financially, (4) the circumstances and condition in life of the distributee, and (5) whether the distributee was dependent on decedent. Pridell, 206 Misc. at 319-20, 133 N.Y.S.2d 207-08 (citations omitted).

## 2. Findings Of Fact

Based upon the record before the Court in this case,[8] the following findings of fact are made pursuant to Rule 52(a), Fed. R. Civ. P.

Garcia was born on May 21, 1951 in the Dominican Republic. Genimiz, the second of Garcia's five children, was born on July 21, 1976 in the United States. Carty was born on December 29, 1968 in the Dominican Republic.

On March 3, 1989, Carty entered the United States. In 1997, Carty and Genimiz began dating. On February 24, 2000, Gilbert, the son of Carty and Genimiz, was born. At some later time in 2000, Garcia arrived in the United States from Puerto Rico, where she had been living.[9] On March 12, 2001, Carty and Genimiz were married. On April 17, 2001, Carty filed an application for permanent resident status with the U.S. Immigrant and Naturalization Service ("INS").

---

[8] It should be noted that although depositions were taken by both parties to this dispute, neither party elected to submit such deposition testimony to the court.

[9] Prior to living in Puerto Rico, Garcia apparently resided in Florida for an unspecified period of time.

During some period of time before and after Gilbert's birth, Genimiz lived with Carty at Sanchez' residence on West 157th Street in New York, New York.

At the time of her death, Genimiz had been employed by McDonald's for four years, earning approximately $13,800.00 per year plus benefits.

Garcia stated she received financial support on a regular basis from Genimiz from the time that Genimiz first began working until the time of her death. According to papers submitted by Garcia, the amount of this support was approximately $100 to $150 per week. However, at the November 2, 2004 hearing, Garcia stated: (1) that during the time that Garcia was in Florida and Puerto Rico, Genimiz sent wire transfers in amounts ranging from $50 and $100, (2) that Genimiz was not obligated to send such wire transfers, (3) that Genimiz did not send such wires on a regular basis, and (4) that Genimiz sent such wires transfers whenever she could because she was aware that the support was needed.

Garcia also stated that during the time that she was living in Florida and Puerto Rico, Genimiz used Western Union and another wire service to provide such funds to her. Nilsa Santiago ("Santiago"), a close friend of Garcia, stated that on two

occasions in 1999, she used Western Union to wire money to Garcia on Genimiz' behalf.

Donald Rigby, a compliance officer for Western Union, stated that a search of Western Union's available business records, which covered the time period November 1999 to November 2004, revealed no wire transfers from Genimiz to Garcia during that time period. Nor did the search reveal any wire transfers from Nilsa Santiago to Garcia. However, the search did show that Garcia received wire transfers from other individuals (e.g., Oscar Cardeza, Aaron Christiana, and Juan Peña) and Genimiz did send a $500 wire transfer to her brother Carlos Romero on February 28, 2000.

Yaritza Villa ("Villa"), who lived with Genimiz from 1997 until some time in 2001, worked with Genimiz during that time, and described Genimiz as a close personal friend, stated that during the period of their acquaintance, Genimiz never stated or otherwise evidenced an intention to provide financial support to Garcia. Villa could not recall any instance when Genimiz received a phone call from Garcia at their shared residence.

Garcia stated that she came to the United States because it was her obligation to help her daughter care for Gilbert and that she cared for Gilbert on a full-time basis so that Genimiz could continue to work. Garcia stated that during 2001, Genimiz

19

would give her money in case Gilbert or one of Garcia's children needed anything. Carty stated that Garcia cared for Gilbert for a minimum of 3-4 days each week, for which Garcia received a weekly fee of $50.

When she arrived in the United States, Garcia lived in a homeless shelter, and she later took up residence at 3080 Decatur Avenue in Bronx, New York. Genimiz apparently spent a certain number of days each week with Garcia at the shelter and then at the Decatur Avenue residence.

Based on Garcia's age, she is expected to live for an additional 380.40 months.

3.    **Conclusions of Law**

A.    **The Motive For Carty's Marriage To Genimiz' Is Irrelevant To The Distribution of Wrongful Death Proceeds**

In support of her argument that she is entitled to some 42 percent of the proceeds from any settlement of the Genimiz wrongful death claim, Garcia asserts that the marriage of Carty and Genimiz was solely for the purpose of obtaining permanent resident status for Carty. However, the grounds for disqualifying a spouse from recovering wrongful death damages are rather narrow. Pursuant to N.Y. Est. Powers & Trusts L. § 5-1.2(a), a husband or

wife is a surviving spouse for the purposes of the wrongful death statute unless it is established satisfactorily to the court having jurisdiction of the action or proceeding that:

(1)  A final decree or judgment of divorce, of annulment or declaring the nullity of a marriage or dissolving such marriage on the ground of absence, recognized as valid under the law of this state, was in effect when the deceased spouse died.

(2)  The marriage was void as incestuous under section five of the domestic relations law, bigamous under section six thereof, or a prohibited remarriage under section eight thereof.

(3)  The spouse had procured outside of this state a final decree or judgment of divorce from the deceased spouse, of annulment or declaring the nullity of the marriage with the deceased spouse or dissolving such marriage on the ground of absence, not recognized as valid under the law of this state.

(4)  A final decree or judgment of separation, recognized as valid under the law of this state, was rendered against the spouse, and such decree or judgment was in effect when the deceased spouse died.

(5)  The spouse abandoned the deceased spouse, and such abandonment continued until the time of death.

(6)  A spouse who, having the duty to support the other spouse, failed or refused to provide for such spouse though he or she had the means or ability to do so, unless such marital duty was resumed and continued until the death of the spouse having the need of support.

N.Y. Est. Powers & Trusts L. § 5-1.2(a).  The plain language of the statute demonstrates that the mere fact that a marriage may

have been entered into for the purpose of supporting an application for permanent resident status does not, without more, disqualify a surviving spouse from participation in wrongful death proceeds. See In Matter of Estate of Dominguez, 2002 WL 31844696, at *5 (Sur. Ct. Bronx. Co. Nov. 18, 2002) (holding that a surviving spouse cannot be disqualified pursuant to § 5-1.2 merely because the marriage was shown to be for the purpose of securing permanent resident status). In Dominguez (which involved a claim arising from the crash of Flight 587), the Bronx Surrogate's Court stated:

> Even though the court has made the factual finding that the marriage was entered into for immigration purposes and that the respondent might have promised to pay the decedent for her assistance in this endeavor, these circumstances do not disqualify the respondent as the decedent's surviving spouse under EPTL 5-1.2 (a). The six subdivisions of EPTL 5-1.2(a) contain the exclusive grounds to disqualify a spouse "within the meaning and for the purposes of 4-1.1, 5-1.1, 5-1.1-A, 5-1.3, 5-3.1 and 5-4.4". Assuming arguendo that a marriage may be annulled on the grounds that the ceremonial marriage was a "sham", the only subdivision of EPTL 5-1.2(a) that the petitioner could reasonably be relying upon is subdivision 1 ... .

> Marriages that may be annulled after the death of one of the spouses for some purposes cannot be used to disqualify a surviving spouse under EPTL 5-1.2(a)(1) due to the explicit statutory language that the judgment of divorce or annulment only results in disqualification if it "was in effect when the deceased spouse died" (Bennett v. Thomas, 38 A.D.2d 682, 327 N.Y.S.2d 139; Parente v. Wenger, 119 Misc.2d 758, 464 N.Y.S.2d 341). Here, the petitioner concedes that there was no annulment that was in effect on any grounds, including fraud or sham, at the time of the decedent's death.

<u>Id.</u>

Here, Garcia has made no showing: (1) that the marriage between Genimiz and Carty had been terminated prior to Genimiz' death pursuant to a valid judgment of divorce or a valid decree of annulment entered either in New York or some other state; (2) that the marriage was incestuous, bigamous or otherwise prohibited; (3) that a final decree or judgment of separation had been entered against Carty; (4) that Carty had abandoned Genimiz; or (5) that Carty had failed to support Genimiz despite possessing the means to do so. Therefore, the underlying motivation for Carty's marriage to Genimiz is irrelevant to the question of how the proceeds from the Genimiz wrongful death claim should be distributed.

Furthermore, the facts that Carty and Genimiz had a child together and also that Genimiz lived for some period of time with Carty at Sanchez' residence indicate that the marriage between them was motivated, at least in part, by genuine romantic sentiment.

### B. There Is No Other Basis To Prevent Carty From Participating In Wrongful Death Damages

In a submission to the court dated November 19, 2004, Garcia argues that Carty took a variety of improper actions -- <u>e.g.</u>, allegedly failing to inform Garcia that an amended petition

had been filed in Manhattan Surrogate's Court -- to prevent Garcia from participating in her daughter's estate. However, none of the alleged conduct, even if proven, would be relevant to the question of whether Garcia had demonstrated that she had suffered pecuniary loss such that she would be entitled to a share of the proceeds from the settlement of the wrongful death cause of action arising from Genimiz' death.

Finally, Garcia has argued that the proposed settlement of the claims arising from Gilbert's death is excessive and is intended to deprive her of her rights of participation in proceeds from the settlement of the wrongful death cause of action arising from Genimiz' death. Garcia has proffered no evidence to support this argument. Moreover, the argument is rendered moot by the Court's determination that Garcia is entitled to a limited distribution of any damages from the Genimiz wrongful death action. (See Part 3C below.

**Redacted Pursuant To The Stipulated Confidentiality Agreement And Protective Order Of September 3, 2002 (MDL No. 1448)**

**An Unredacted Version Of This Opinion Was Filed Under Seal On May 2, 2005**

Redacted Pursuant To The Stipulated Confidentiality
Agreement And Protective Order Of September 3, 2002
(MDL No. 1448)


An Unredacted Version Of This Opinion Was
Filed Under Seal On May 2, 2005

Redacted Pursuant To The Stipulated Confidentiality
Agreement And Protective Order Of September 3, 2002
(MDL No. 1448)


An Unredacted Version Of This Opinion Was
Filed Under Seal On May 2, 2005

Redacted Pursuant To The Stipulated Confidentiality
Agreement And Protective Order Of September 3, 2002
(MDL No. 1448)


An Unredacted Version Of This Opinion Was
Filed Under Seal On May 2, 2005


It is so ordered.

New York, NY
April 2/ , 2005

ROBERT W. SWEET
U.S.D.J.